## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re: | Chapter 12 |
| | Case No. 14-03119-dd |
| Ryan Evan Pressley, | |
| Debtor. | |

THIS MATTER is before the Court to consider the motions of creditors AgSouth Farm Credit, ACA ("AgSouth"), Jones Farm, LLC ("Jones Farm"), the United States of America on behalf of the Farm Service Agency ("the FSA"), and the chapter 12 trustee ("Trustee") to dismiss the case with prejudice. The Court held a hearing on the motions to dismiss October 8, 2014 and, after consuming the morning, continued the hearing to October 9, 2014. The parties submitted testimony and other evidence. At the conclusion of the hearing, the Court briefly announced its ruling that the case would be dismissed with prejudice for 270 days. The following order sets forth the Court's findings of fact and conclusions of law.

### I. Facts

This is the third chapter 12 bankruptcy filing of Debtor Ryan Evan Pressley. All of the filings were made to stop foreclosure. He filed the first case on April 30, 2012 (12-02757-dd). That case was dismissed on November 7, 2012, after this Court denied confirmation of a modified plan and the Debtor failed to file a further amended plan as directed by the Court. The Debtor filed a second case on May 30, 2013 (13-3176-dd). In that case, the Court, after holding a combined hearing on confirmation of Debtor's Plan and creditors' motions to dismiss, again denied confirmation and dismissed the case. The Court's November 14, 2013 order sets out in greater detail the facts leading to dismissal in the second case. In summary, the Court found that the estate suffered from continuing losses and there was an absence of a reasonable likelihood of

1

rehabilitation. The Court dismissed the case without prejudice, but cautioned the Debtor that the findings of the second case would be considered in any future case unless the Debtor showed significant changes. The Debtor filed this third case on May 30, 2014.

Debtor owns, subject to liens, a 117.54 acre farm in Lexington, SC, a 256.41 farm in Blackville, SC, and a home in Martinez, GA, where his parents live. The Debtor has transitioned the farms from cattle and turf operations to vegetable row crops. He has been farming on his own since 2008 but has never made a profit from farming alone. From 2008 – 2012, his losses totaled over $700,000. Although his tax return reflects a modest profit of $9,289 in 2013, this profit was the result of government program payments. Debtor's farm operation does not service his debt.

According to the Debtor's monthly operating reports, the Debtor lost $2,303.87 in the first bankruptcy (May 2012 through September 2012); made $5,142.23 during the second bankruptcy (May 2013 through September 2013); and made $4,618.27 during this bankruptcy (June 2013 through August 2013). This again is in the absence of secured debt payment.

Despite historical poor performance, the Debtor has continually provided the Court with optimistic projections. He projected in the second case that the farm would have a gross income of $214,400 in 2013 and provide $67,331.40 to make the plan's proposed interest payment.[1] His 2014 projected net income in that case was $203,285. In this case, the Debtor projects that the farm income will increase in 2015 to $713,400 and, after expenses, there will be $97,013.05 for plan payments. These projected profits are clearly far higher than any profits the farm has ever realized.

While in bankruptcy the value of Debtor's property has declined while the debts to his creditors have increased. The Blackville property value was scheduled at $564,000 for the first two bankruptcies, but in the third its value declined to $461,400. The Lexington property was

---

[1] The initial projection for gross farm income in the second case was $722,350.

2

scheduled at $632,611, then $635,000, but has now declined in value to $350,000. The Martinez property has decreased from $300,000 in the first bankruptcy to $285,000 in the second and third.[2]

All of these properties are encumbered: creditors Jones Farm, AgSouth, and the FSA hold first, second, and third liens on the Blackville property, respectively; AgSouth and the FSA hold first and second liens on the Lexington property, respectively; and Wells Fargo holds the lien on the Martinez property.[3] The FSA's lien increased from $664,865.91 in the first bankruptcy to $709,055.53 by the third. The debt to Wells Fargo increased from $225,505.04 in the first bankruptcy to its current total of $231,430.48. The Jones Farm lien increased from $532,000 in the first bankruptcy to now $625,483.82. Finally, the AgSouth debt has increased from $989,145.91 in the first bankruptcy to $1,317,885.79. Overall, the Debtor's property values have decreased since the first filing by roughly $400,000, but his secured debt has increased by nearly $1 million.[4]

Creditor AgSouth provided evidence and testimony to the Court in support of the creditors' motions to dismiss.[5] AgSouth presented testimony from its special assets manager, Gene

---

[2] The Court does not find that the decrease in value of the property is the fault of the Debtor but simply notes the values advocated by Debtor.

[3] The lien amounts are from the proofs of claim filed in each case.

[4] According to the Debtor's schedules, in the first bankruptcy, the total value of his real property was $1,469,611 and secured creditors held liens totaling $1,793,685. By the third bankruptcy, his total real property value was $1,096,500 and secured creditors held liens amounting to $2,768,006.14. Although the Debtor's machinery and crops were also collateral for some of these loans, the value of those in the schedules has also decreased and, regardless, is not significant enough to make up for the large deficit the creditors are facing on account of the decreasing value of the real property collateral versus the increasing debt.

[5] Prior to the Court taking evidence, the Court heard argument on the Debtor's objection to the motions to dismiss. The Debtor's objection, filed the day before the hearing, argued that the motions to dismiss could not be pursued because they were joinder pleadings and the underlying motion to dismiss had been withdrawn. The motion to dismiss was originally filed by the United States Trustee ("UST"). AgSouth, Jones Farm, and the FSA all joined in the motion and added additional reasons and arguments for dismissal. The UST's motion was withdrawn on September 22, 2014. It has long been the practice of this court to permit parties that have joined in a motion to continue prosecuting that motion despite withdrawal of the initial motion. Regardless, the UST's withdrawal specifies, in a footnote, that AgSouth's consent to withdrawal is "in no way intended to undermine any of the arguments" it raised. This fact, combined with the fact that the hearing remained on the Court's calendar, was sufficient to put the Debtor on notice that the withdrawal did not moot the motions' prosecution. There was no

McCutchen. McCutchen testified that a week before the hearing, he went to inspect the Debtor's farm operations. McCutchen took pictures of the crops which were introduced into evidence as Exhibits 17 A – Q. He stated that he did not see any activity in the fields while he was at the farm; that the crops were growing poorly because of weed pressure; and that many of the fields had been planted too late to harvest prior to the anticipated frost date in mid-November. McCutchen also testified that the months the Debtor had been in bankruptcy in each of the three cases were generally the most profitable farming months for vegetable farms, so the monthly operating reports should be showing the Debtor's most positive monthly performances of the year. The Debtor's past and current performance as illustrated by the tax returns and monthly operating reports clearly support the creditors' assertions that the Debtor's projections are unrealistic and there is no hope of rehabilitation.

The Debtor testified that this bankruptcy would be different because he anticipated a substantial operating loan of $250,000 from a neighbor, Joe Parker. Parker had previously provided the Debtor with loans, but the Debtor asserted that those had either been repaid or had been assumed by Debtor's father. Testimony and documents establish that Parker loaned the Debtor's father money during the previous case – money that was subsequently loaned to the Debtor to support his farm - and this fact was not only not disclosed to the Court during that case, but had also been actively hidden by the Debtor's father.

The terms of Parker's promised loan in the current case are not clear. Parker testified at a Bankruptcy Rule 2004 exam that the $250,000 figure was one that seemed like "a good number to work with" and that there was no current draft loan agreement. Exh. 12, Parker Depo. 72:4; 73:10 – 20. He further testified that the interest would be ten percent, but potentially waivable

---

prejudice to the Debtor; indeed, at the hearing, counsel indicated to the Court that they had been in discussions regarding the hearing during the time between the UST's withdrawal and the date of the hearing. The Debtor's objection to the motions to dismiss is therefore overruled.

(that is, subject to change); and that while there would be no set repayment schedule, the loan would not be "open ended … forever." *Id*., 74:7 – 75:23. In addition, Parker testified that the money would be available on an "as-needed" basis rather than available in one lump sum. *Id*., 79:25 – 80:16. The standard for "as-needed" was unclear, instead, the Debtor would need to "prove he needs it and somebody is going to watch it." *Id*. Parker did not appear at the hearing.

The Debtor did not disagree that Parker's promise to make a loan was not in writing and that the terms had not yet been finalized. Regardless, the Debtor testified he was confident that the loan would be forthcoming. Notably, the Debtor's projections rely heavily on receiving the $250,000 lump sum from Parker in January 2015 to finance his farming operations. The Debtor admitted the farm could not operate without this cash infusion.[6] When pressed by AgSouth's counsel as to what he would do if he didn't receive the loan from Parker, the Debtor stated he would seek financing from a family member. He did not have any specific information or evidence supporting his assertion that he could obtain a loan from a different source.

Debtor also stated that this bankruptcy would be different because he had buyers lined up for his crops. Much like the details of the Parker loan, the details of the arrangements with these buyers are unclear. The current broker the Debtor is working with is Farm to You, which is owned by the Debtor's father. The Debtor did not have a written contract with Farm to You nor did he provide the Court with any details regarding how much Farm to You had pledged to buy or at what prices. He testified to a second buyer who was also a buyer in the 2013 case. There were no buyers present at the hearing. The Debtor's situation in the previous case was similar: he testified at the § 341 meeting of creditors that he had six buyers in line to buy his crops but did not have any written contracts or details regarding the arrangements. As with this case, no

---

[6] The Debtor testified in the 2013 case that he could not successfully operate in 2014 without an operating loan. He did not receive one and was not financially successful in 2014.

contracts or buyers materialized. At best, the Debtor's situation with regards crop buyers is the same; perhaps it is worse.

Finally, the Debtor testified in response to McCutchen's analysis of the fields and the photographs. The Debtor felt confident that the crops would be ready for harvest prior to the frost and that he would be able to harvest roughly 120 bushels per acre and sell the produce at $18 per bushel. He did not disagree that this projection was far in excess of his farm's previous performance. He disagreed with McCutchen's assessment of the fields, stating that the photographs were not accurate representations of the fields because they focused on the parts of the field that looked less well-maintained. He asserted that the weeds in the photos were largely gone now because the fields were plowed after McCutchen's visit. He stated that he had meant to bring updated photos to court, but did not get them to his attorney in time. Finally, the Debtor testified that he believed the projections in the plan for the upcoming year were realistic because the Parker loan would ensure the planting could begin on time, and the transition of the operation to row vegetables would mean that more acreage would be farmed. Again, he provided no evidence aside from his opinion in support of these projections and assertions.

## II. Conclusions of Law

### A. Dismissal Is Proper Under § 1208(c)(1)

Section 1208(c)(1) provides that a court may dismiss a case for cause, including "unreasonable delay, or gross mismanagement, by the debtor that is prejudicial to creditors." The section requires the court to first find that there was either unreasonable delay or gross mismanagement, and then find that this resulted in prejudice to the creditors. 8 Collier on Bankruptcy ¶ 1208.03[1] (Alan Resnick & Henry J. Sommer eds., 16th ed.). Unreasonable delay can include multiple unrealized attempts to confirm a plan, with prejudice resulting due to

"debtors … enjoy[ing] the protection of the automatic stay while creditors … [watch] the value of the estate dwindle." *United States v. Suthers (In re Suthers)*, 173 B.R. 570, 572 (W.D.Va. 1994).

This case, when viewed in light of the totality of the Debtor's circumstances and the previous filings, has clearly resulted in unreasonably delay and prejudice. Since 2008, the secured creditors have only received one interest payment, and the Debtor has made no payments to these creditors while under the protection of the Bankruptcy Code. The creditors' efforts at foreclosure have been stayed three times. The Debtor has had three chances to improve the results of his farming operation and has not done so. As the Debtor struggles, the creditors watch the value of their collateral decrease while their debts increase due to interest and the continuing costs from attempts to collect. This situation has now continued for nearly six years. Dismissal is appropriate.

Dismissal is also appropriate in this case due to "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1208(c)(9). During the past four months the Debtor has been in bankruptcy, he has provided no debt service to his creditors; his farming operations, despite optimistic promises, have barely improved; and he has been unable to secure a either a new operating loan or commitments from buyers. Similarly, in the previous case, the Debtor was unable to profitably sustain his farming operations; unable to provide information about much-needed future loans or buyers; and unable to maintain sufficient cash flow to pay his creditors. There has been no substantial change in circumstances from the previous case aside from increasing debts and decreasing collateral. Losses mount, the estate continues to diminish, and there is no hope of rehabilitation. As with the previous case, dismissal is also appropriate under § 1208(c)(9).

7

## B. Prejudice Is Warranted

Dismissal of a bankruptcy case is ordinarily without prejudice to the filing of a subsequent case. *See* 11 U.S.C. § 349(a). The Fourth Circuit has recognized that bankruptcy cases can be dismissed with prejudice barring re-filing when there is evidence of bad faith. *Colonial Auto Ctr. v. Tomlin (In re Tomlin)*, 105 F.3d 933, 937 (4th Cir. 1997). The general rule is that dismissal with prejudice is warranted when there is "egregious behavior" that prejudices creditors and is abusive of the bankruptcy system. *Id*. The filing of multiple petitions to prevent foreclosure within short periods of time when there is no hope of reorganization is a sign of bad faith. *Tomlin*, 105 F.3d at 941 – 42; *Casee v. Key Bank Nat'l Ass'n (In re Casse)*, 198 F.3d 327, 332 (2d Cir. 1999) (filing three successive chapter 11 petitions and one chapter 13 petition warranted dismissal with prejudice). To determine whether there is bad faith, a court should look at the totality of the circumstances. *In re Leavitt*, 209 B.R. 935, 939 (B.A.P. 9th Cir. 1997).

The Debtor has only made one payment to his secured creditors since 2008; he has attempted to reorganize his farm three times in the past three years with no success; his farming operations historically have not been profitable despite financial assistance from others; and, most importantly, he has never provided this Court with evidence to supporting his assertion that he will increase profits from less than $10,000 to over $100,000. Debtor's hope to reorganize and succeed is heartfelt, but so implausible as to constitute a bad faith effort to thwart foreclosure when creditors have not been paid in six years. Debtor's belief that his farm plan can support the debt he has incurred is unrealistic and his continued effort to shield himself through a bankruptcy filing after this third failure would be a patent abuse of the Bankruptcy Code. The Court therefore orders that the Debtor's case be dismissed with prejudice. The Debtor is barred from filing another petition under the Bankruptcy Code for a period of 270 days.

### III. Conclusion

For the reasons stated above and those announced at the October 9, 2014 hearing, the case is dismissed. The Debtor is barred from filing another petition under the Bankruptcy Code for a period of 270 days.

IT IS SO ORDERED.

**FILED BY THE COURT**
**10/16/2014**



Entered: 10/16/2014

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina